## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL SALLIE** and **MELINDA PERKINS**, <br><br> Plaintiffs, <br><br> vs. <br><br> **BRYAN LYNK**, individually and in his official capacity as a Police Officer of Midland Borough; **BRUCE TOOCH**, individually and in his official capacity as a Police Officer of Midland Borough; **RONALD LUTTON**, individually and in his official capacity as a Police Officer of Midland Borough; **GEORGE HRUBOVCAK**, individually and in his official capacity as a Police Officer of Midland Borough; and **MIDLAND BOROUGH**, <br><br> Defendants. | 2:10cv456 <br> **Electronic Filing** |

## OPINION

Plaintiffs Michael Sallie ("Sallie") and Melinda Perkins ("Perkins") (collectively "plaintiffs") commenced this action pursuant to 42 U.S.C. § 1983 seeking redress for violation of their rights stemming from their alleged unlawful arrests.  Plaintiffs aver that defendant police officers Ronald Lutton ("Lutton"), Bruce Tooch ("Tooch"), George Hrubovcak ("Hrubovcak"), and Brian Lynk ("Lynk") (collectively "the officer defendants") violated their rights under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  Midland Borough ("the Borough"), the officer defendants' employer, also is named as a defendant and is alleged to be a moving force behind the violations due to its failure to review officer applications for employment sufficiently and/or to provide adequate police training.  Presently before the

court are cross motions for summary judgment.  For the reasons set forth below, the defendants' motion will be granted and plaintiffs' motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough of West

Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory

allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846

(3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary

judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal,

Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is

colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477

U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362

(3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh

facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the

evidence).

The present case arises from events that occurred on Friday, May 8, 2009, outside of

plaintiffs' home, then located at 339 Penn Avenue in Midland, Pennsylvania.  The house is on the

right side of a duplex when viewed from the street, with two flights of stairs leading to the porch.

Roosevelt Kirby ("Kirby") resided on the left side of the duplex.  An empty lot was next to

Kirby's residence.

Kirby was having a party that evening with loud music and approximately 20 people in

attendance.  The music from the party was getting too loud for plaintiffs to continue watching

television, so they went onto their porch, leaving their nine-year-old daughter Mikayla inside.

At about 10:30 p.m., the officer defendants were in the operations room of the police

station when a 911 call came in regarding a disorderly white male in the area of 349 Penn

Avenue.  At that time, Lynk and Tooch were coming off duty and Lutton and Hrubovcak were

coming on duty.  All four officers responded to the call.  Lutton and Hrubovcak went in one car

with Lutton driving, and Lynk and Tooch went in another with Tooch driving.

3

The two police cars arrived near 339 Penn Avenue with the Tooch/Lynk car right behind the Lutton/Hrubovcak car.  Each side has presented significantly divergent accounts of what happened next.

The officer defendants contend that upon their arrival, an individual known to them as Patrick McClain was on the back of Roger Singleton on the sidewalk near plaintiffs' residence. Hrubovcak observed McClain, with blood on his face, jump onto Singleton's back, put his arms around him, and choke him.  The two men were on the sidewalk in front of 339 Penn Avenue, which is approximately 10 to 15 yards in front of Sallie's house.  McClain was well-known to the officers as a very violent person who had a history of throwing and/or spitting blood on officers and calls from his mother regarding violent behavior in the McClain household.

Believing Singleton and McClain were fighting, Hrubovcak gave several orders to McClain to stop and get off of Singleton's back.  While Lutton and Hrubovcak were attempting to get McClain off Singleton's back and arrest him, the individuals from the party who were outside Kirby's place in the lot next door began to focus on the officers' actions.  Sallie, who remained on his porch, repeatedly yelled phrases at the officers such as "that's not right," "you're not right," "he's just drunk," and "he's not fighting anybody."  A group of about twenty individuals then began to move closer to the officers and Sallie's porch.

The more Sallie yelled, the more the crowd started to yell at and approach Tooch and the other officers.  Tooch told Sallie to "shut up, and go in [his] house."  Sallie responded: "this is my house. I am not going in the house."  The crowd continued to move closer to the officers.

After becoming aware of the crowd drawing closer in response to Sallie's shouting, Tooch started up the stairs to Sallie's porch to get him to stop yelling and go back in his house.  Tooch believed that this measure was necessary to maintain crowd control and officer safety.  Lynk

followed and called for back-up over his shoulder-mounted microphone. When Sallie refused to go back inside, Tooch attempted to arrest Sallie for failure to disperse and told him to place his hands behind his back. Sallie refused. As Tooch was attempting to handcuff Sallie, Perkins came out and tried to shove Tooch out of the way. Sallie then locked his arms around Perkins and refused to let go of her. Lynch and Tooch forcibly separated the two and Perkins jumped on Tooch's back. Tooch shook her off.

Lynk then tried to handcuff Sallie. Perkins grabbed Lynk's arm. Sallie turned his back and locked his arms in front of him so he could not be handcuffed. Lynk told Sallie to stop resisting. Sallie continued to do so. Lnych then took out his taser, removed the cartridge and delivered a "drive stun" for two to three seconds in the middle of Sallie's back. Lynk was then able to handcuff Sallie.

In the meantime, Lutton and Hrubovcak were able to arrest McClain and had started to move him toward the police car for pat-down and transport. Hrubovcak had witnessed Perkin's interference with the efforts to place Sallie under arrest. He ran up on the porch and pulled Perkins off of Lynk's arm. Hrubovcak then placed Perkins under arrest and handcuffed her.

Lynk escorted Sallie to the police car for pat-down and transport. Hrubovcak took Perkins.

By this time, the crowd had moved in front of Sallie's place and other residents from across the street had come out. Approximately 30 to 40 people had gathered in the vicinity, including individuals from adjacent houses and across the street. As Lynk took Sallie toward the car, he placed a second call for assistance, this time making a high priority "all available" request. Officers from surrounding communities arrived on the scene and McClain, Sallie and Perkins were taken to the station.

Plaintiffs' version is quite different.  They witnessed McClain fall on the sidewalk. Singleton helped McClain back up.  McClain was having difficulty standing due to his intoxication.  McClain merely was leaning on Singleton when the police arrived.

Lutton and Hrubovcak tackled McClain, taking him to the ground, and they started kicking him.  Sallie's comments merely were critical of this police conduct and were delivered in a non-threatening manner.  They were not directed toward or at the crowd and there was no interaction between Sallie and the crowd.  Sallie did not threaten the officers, attempt to punch or strike the police, throw anything, brandish a weapon, or direct the crowd to interfere with the police. Throughout the entire incident Sallie remained on his porch.

Plaintiffs maintain that no order to "be quiet and disperse" was ever given.  Tooch just went up on Sallie's porch, and Lynch and Hrubovcak followed.  Sallie, seeing the officers charging up his steps, turned toward his house and put his arms around Perkins, who was in front of him.  When Sallie was told he was under arrest, neither he nor Perkins offered any resistance. Sallie did hold his arms in front of himself.  While being placed under arrest, Lynk tased Sallie twice, and then handcuffed him.  Hrubovcak took hold of Perkins' arms, placed them behind her back and handcuffed her.  At no time did either Sallie or Perkins struggle with the police. Thereafter, Lynk escorted Sallie to the police car and Hrubovcak escorted Perkins.

When Sallie and Perkins were taken from the scene, Mikayla was left inside without adult supervision.  Neither Sallie nor Perkins told the officers that Mikayla was in the house.  Sallie's parents lived across the street and Sallie's mother had to come over to assume supervision of Mikayla.

At the station, Sallie was charged with the following:

- resisting arrest, 18 Pa. Cons. Stat. Ann. §5104;
- failure of disorderly person to disperse, 18 Pa. Cons. Stat. Ann. §5502;

6

- disorderly conduct, 18 Pa. Cons. Stat. Ann. §5503;
- obstructing the administration of law or government, 18 Pa. Cons. Stat. Ann. §5101; and
- riot, 18 Pa. Cons. Stat. Ann. §5501.

Perkins was told she was being arrested for a summary offense of disorderly conduct under 18 Pa. Cons. Stat. Ann. §5503.   Perkins did not receive a summary citation and was never prosecuted for the alleged offense.

Sallie's parents, who were over the age of 70, went to the station to check on Sallie and Perkins.  Sallie's mother approached the police car in which Perkins was seated in the back. Sallie's father attempted to enter the station.  Hrubrovcak drafted charges against them for failure of disorderly persons to disperse, obstruction of justice, and riot.

Sallie was on probation.  A condition of his probation was to avoid being arrested.  Sallie's arrest resulted in a detainer being filed based on an alleged probation violation and Sallie was placed in the county jail.  Sallie remained in jail for 31 days.

Sallie received a preliminary hearing on the charges on July 30, 2009, before a local magistrate judge.  The assistant district attorney appeared at the hearing without the police reports and other paperwork that had been generated after the May 8, 2009, incident.  Officers Lynk and Tooch testified at the hearing.  The magistrate judge dismissed all the charges against Sallie.

Despite being arrested and told she would be charged, the officers never filed charges against Perkins.  Aside from McClain, the officers did not file charges against anyone present on the night of May 8, 2009.

Sallie suffered physical pain from being handcuffed and tased.  He also experienced emotional stress and mental anguish from being incarcerated in that he could not eat, or sleep, lost 15 pounds, became dehydrated and experienced an increase in his blood pressure.  Sallie worried about Mikayla and Perkins while he was in jail because they would cry sometimes when he called

home.  He lost a chance to be considered for a promotion at work.  He incurred legal fees and lost

wages.  These financial constraints affected the scale of Sallie and Perkin's formal wedding.

Individuals seeking positions as officers with Midland Police Department must fill out

applications and provide their educational background, work history, references, and other

qualifications.  Applicants must have Act 120 Certification from the Municipal Police Officers

Education and Training Commission.  This education and certification program is mandated by

the Commonwealth of Pennsylvania.  See 53 P. S. 2161 *et seq*. and accompanying regulations.[1]

Act 120 Certification requires applicants to undergo and pass numerous minimal levels of

competence in education and reading, physical examination and fitness requirements,

psychological examination and fitness requirements, background investigation and clearances, a

basic police training course encompassing among other things firearms and first-aid/emergency

CPR training, and so forth.  Act 120 training is a 9-month course in which applicants learn

general legal principles, criminal and vehicle procedures, prisoner handling, proper use and

handling of firearms, and other routine police procedures.

Midland Police Department provides officers, upon their hire, with a copy of the

Department's Policy and Procedures Manual.  The manual includes mandated procedures

governing arrests, the use of force procedures, the use of force continuum, and taser use.  The

Manual periodically is supplemented with updates in the form of email bulletins and articles

compiled by Midland's chief of police from various sources.  Officers are directed to read the

Manual and be familiar with the policies and procedures therein.  There is no formal measure or

procedure undertaken to assure that newly hired officers review the Manual and understand its

mandates.

---

[1] The Commission also is charged with discipline and revocation of certification in conjunction
with certain events or conduct.  See id. at § 2164(1).

New officers undergo on the job training with the chief.  The chief rides around with the officers on patrol in order to get them familiar with the Borough and its policies and procedures. During this training the chief asks the new officers questions about the Borough's policies and procedures.

All Borough officers are required to maintain their Act 120 Certifications.  This consists of attending two days of training a year provided by the Municipal Police Officer Education Training Commission. In addition, municipal officers are required to undergo yearly recertification in CPR and firearms training.  The firearms training covers the use of tasers.

Midland  Borough employees must be certified to use a taser which entails training from a certified taser instructor.  The officers must be re-certified for taser use on a yearly basis by a certified taser instructor.  This training references and is predicated on the use of force and the use of force continuum.

The chief also makes available in the police operations room two binders that contain new and recent orders and directives, updates on recent crimes, local Allegheny County cases, and general developments in law and procedure as well as the monthly PA bulletin reporting synopses of recent cases.  The binders are updated regularly and available for all officers to review.  The chief has issued an outstanding order directing the officers to review the binders regularly.  There is no procedure to verify that the officers actually review them.  The chief has on occasion disciplined officers for failure to comply with directives posted in the binders.

Beginning in May of 2008, Joseph A. D'Itri ("D'Itri") was Midland's acting Chief of Police, and he became the police chief in February 2009.  Former Midland Chief of Police Bongivengo ("Bongivengo") resigned in February of 2008.

When Hrubovcak applied for employment with the Borough, he disclosed on his application that he had been involved in an incident in Florida where he was accused of using excessive force.  Chief Bongivengo contacted the Collier County Sheriffs Officer in Florida and learned after further inquiry that the charges in a civil suit against Hrubrovcak had been dismissed.  The Chief's investigation lead him to conclude that the allegations against Hrubrovcak were without merit and he had been exonerated.  Chief Bongivengo and Mayor Atkins asked Hrubrovcak about the incident when they interviewed him and were satisfied with his explanations.  Hrubrovcak resigned sometime after the incident with plaintiffs in order to accept a new position as a police officer in Vermont.

Tooch was employed as a police officer with White Township, Pennsylvania, in 2007 and was suspended and later terminated in that year for failing to follow police procedures.  He was reinstated within a day after presenting proof that he had not received notice of a scheduled hearing.

At Midland, Tooch was suspended on three occasions in 2008 for failure to follow department procedures and guidelines.  He failed to appear at court hearings, used a taser on a raccoon and failed to complete citations.  Tooch was suspended on three additional occasions in 2009-2010 and terminated in August of 2010 for failure to maintain a valid driver's license and follow police rules and procedures.  Tooch had been driving without a valid license for more than a year.  Tooch explained to the Borough that he was unaware that his license had been suspended.

Lynk was arrested for and charged with malicious assault in June of 2009 in Hancock County, West Virginia, for assaulting a patron in the parking lot of a nightclub.  He was off duty at the time of the incident.  Lynk was terminated from the Borough based on this event.  He

asserted that he had been attacked and acted in self-defense.  Ultimately the charges against him were dismissed and he was exonerated on the basis of self-defense.  Pursuant to a settlement with the Borough, Lynk currently remains on the roster even though he is not serving in an active capacity.

The Borough moves for summary judgment on the ground that plaintiffs have failed to advance sufficient evidence to support § 1983 liability against a municipality under Monell v. New York City Depat. Of Social Services, 436 U.S. 658 (1978).  Specifically, it maintains that plaintiffs cannot prove the existence of any policy, custom or practice or other "deliberate action" that was the "moving force" behind and cause of plaintiffs' claimed injuries.  In other words, the training provided to its officers was adequate and plaintiffs have failed to present evidence to support a finding that it was deliberately indifferent to the constitutional rights of the citizens who come in contact with its police.

Plaintiffs maintain that the record will support the imposition of Monell liability.  They note that the Borough does not provide any training outside the basic and minimal training required under Act 120 and the police department has no measures of its own to assure that the officers are and remain properly trained.  The officers involved were unable or failed to recognize the fundamental rights plaintiffs were exercising under the First Amendment.  The officers demonstrated a pattern of behavior that reflects the Borough's deliberate indifference in assuring proper (1) screening is conducted at the hiring stage, (2) ongoing training is mandated after becoming employed and (3) supervision and discipline is imposed for behavior that evidences callousness toward or disregard of the rights of citizens.  This indifference was behind and can be found to have led directly to the violation of plaintiffs' rights.

11

In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right. [2] Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law deprived him of a federal right.") (citing Groman, 47 F.3d at 633).

Whether a municipal entity can be held liable under § 1983 is governed by the doctrine announced in Monell.  There, the Supreme Court held that "[a] municipality or other local government may be liable under § 1983 if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, -- U.S. --, 131 S.Ct. 1350, 1359 (2011) (quoting Monell, 436 U.S. at 692).  However, such entities "are responsible only for 'their own illegal acts' [and] are not vicariously liable for the acts of their employees." Id.  (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)).  In other words, liability against such an entity may not be established by the *respondeat superior* doctrine, but instead must be founded upon evidence indicating the government itself supported a violation of the plaintiff's constitutional rights.  Monell, 436 U.S. at 694; see also Bielevicz v. Dubinon, 915 F.3d 845, 849-50 (3d Cir. 1990)  ("municipal liability attaches only when

---

[2] Section 1983 creates liability  against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'") (quoting Monell, 436 U.S. at 694).

In order to establish municipal liability a plaintiff must prove that "action pursuant to official municipal policy caused the deprivation" of a federal right.  Connick, 131 S. Ct. at 1359 (quoting Monell, 436 U.S. at 691).  Official municipal policy includes formal policy, acts of official policymakers and "practices so persistent and widespread as to have the force of law." Id. (collecting cases); accord Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir.2010) (To rise to the level of a policy a custom or practice must be "so permanent and well settled as to virtually constitute law.").   "These are 'actions for which the municipality is actually responsible.'"  Connick, 131 S. Ct. at 1359  (quoting Pembaur, 475 U.S. at 479-80).

Proving a government policy or custom can be accomplished in a number of different ways.  Bielevicz, 915 F.2d at 850.  "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict."  Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur, 475 U.S. at 481).  Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law.  Id. (citing Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 42 U.S. 919 (1989)).

A local government's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy" in limited circumstances.  Connick, 131 S.Ct. at 1359.  But "a municipality's culpability for depriving rights

is at its most tenuous where a claim turns on a failure to train." Id.; see also Oklahoma City v. Tuttle, 471 U.S. 808, 822–23, (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is 'far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell.'").  Accordingly, proving liability based on a failure to train requires a showing that in establishing the policy the municipality was "deliberate[ly] indifferen[t] to the rights of persons with whom the [untrained employees] come into contact." Id. (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)).   "Only then 'can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983.'" Id. at 1359-60 (quoting Canton, 489 U.S. at 389).  It also requires a showing that the lack of training actually caused the constitutional violation in question.  Id. at 1358; id. at 1368 (Alito, J., concurring) ("But in any event, to recover from a municipality under 42 U.S.C. § 1983, a plaintiff must satisfy a 'rigorous' standard of causation . . . ; he must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (quoting Board of County Commissioners of Bryan County v. Brown, 520 U.S397, 404-05 (1997)).  These standards are designed to assure that municipal liability under § 1983 does not collapse into respondeat superior liability.  Id. at 1364 ("As our precedent makes clear, proving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents 'difficult problems of proof,' and we must adhere to a 'stringent standard of fault,' lest municipal liability under § 1983 collapse into respondeat superior.") (quoting Bryan County, 520 U.S. at 406); accord Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) ("When a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to ensure that the municipality in a § 1983 suit is not held liable solely for the conduct of its employee.").

14

"'Deliberate indifference' is a stringent standard of fault, requiring proof that municipal actor disregarded a known or obvious consequence of his action." Connick, 131 S.Ct. at 1359 (quoting Bryan County, 520 U.S. at 410).  Municipal policymakers are required to be on actual or constructive notice that a particular omission in the entity's training is causing employees to violate citizens' constitutional rights.  Id. at 1360 (citing Bryan County, 520 U.S. at 410).  It is the decision not to change course after gaining such notice that propels the adherence to the chosen course of action, in effect a "policy of inaction," to the "functional equivalent of a decision by the [policymakers] to violate the Constitution." Id. (quoting Canton, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).  In other words, "[p]olicymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability." Id. (quoting Bryan County, 520 U.S. at 407).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[3] Id.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bryan County, 520 U.S. at 409).  This can be done by presenting evidence of similar constitutional violations by employees of which the policymaker was or should have been aware. Id. at 1360-61.  The violations must be of sufficient similarity to impute notice of an actual

---

[3] Requiring a less stringent standard would result in "*de facto respondeat superior* liability on municipalities." Id. (quoting Canton, 489 U.S. at 392 and citing Pembaur v. Cincinnati, 475 U.S. 469, 483 (1986)(opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternative by [the relevant] officials …")).

pattern; mere notice of multiple violations of a constitutional right in differing ways will not suffice. Id. at 1360.

Here, defendants have identified an extensive and ongoing system of training implemented to provide municipal officers with the tools and experience needed to perform basic employment duties in a competent manner that is designed to minimize the risk that citizens' rights will be subject to constitutional violation.  This system was created by the Commonwealth and all municipal officers are required to meet the established minimal levels of testing and education.  The defendant officers obtained Act 120 clearance before being employed by the Borough and there is no evidence that they failed to meet the ongoing yearly training requirements.  Given the mandated statewide system, the makeup of the Commission, see 53 P.S. § 2163(a), and the Commission's powers and duties, see 53 P.S. § 2164, the Borough could presume that the training needed to obtain and maintain Act 120 clearance provided adequate protection for citizens' constitutional rights until they had actual or constructive notice to the contrary.

In addition, Borough officers undergo additional yearly firearms training and obtain yearly taser and CPR certification.  The officers are also under order to review the updates placed in the binders by the Chief of Police.   There is no evidence that this entire regiment of training somehow overlooks a critical area where citizens' constitutional rights are placed in jeopardy.

Against the above backdrop, plaintiffs have failed to present anything beyond unsupported argument to show that some area of training essential to the protection of citizens' rights has not been taken into account and covered by the existing training regiment utilized by the Borough. Plaintiffs do not identify any prior incident where Borough officers violated a citizen's First Amendment rights.  Apparently, they seek to meet their burden by asserting a series of premises

about supervision, a purported lack of knowledge on the part of the officers on how to handle the situation confronting them on May 8, 2009,  and the cobbling together of a handful of unrelated events involving one incident of alleged use of excessive force by Hrubrovcak prior to his employment, a number of unrelated incidents where Tooch failed to follow appropriate procedure in performing the duties of employment, and an off-duty nightclub incident where Lynk was involved in an altercation with another nightclub patron.

The grounds advanced by plaintiffs fall far short of the mark.  First, none of the grounds identified supply a basis from which the finder of fact could conclude that the Borough's policymakers knew or should have known that continued adherence to the training or supervision utilized within the police department would result in violations of citizens' First or Fourth Amendment rights.  Plaintiffs fail to identify a single pre-event incident of which the Borough was aware that involved an alleged violation of another citizen's rights for speaking out about the decision to arrest someone for disorderly conduct or public drunkenness or the unnecessary and thus unlawful use of a taser in making an arrest.  The reference of other areas where plaintiffs perceive shortcomings in supervision and pre-hiring background investigation do not supply a basis for finding that the Borough's policymakers made a conscious choice to continue with a constitutionally deficient program.  Cf. Connick, 131 S. Ct. at 1360 (evidence of four prior Brady violations not involving the suppression of blood evidence or a lab report was incapable of placing the district attorney on notice that specific training was necessary to avoid that particular type of Brady violation).

Second, plaintiffs' reliance on the officers' conduct on and after May 8, 2009, is misplaced. It is beyond reproach that neither cotemporaneous nor subsequent conduct can supply the pattern of violations needed to provide notice to municipal policymakers and an opportunity to conform

to constitutional requirements.  Id. at 1360, n.7 ("contemporaneous or subsequent conduct cannot

establish a pattern of violations that would provide 'notice to the cit[y] and the opportunity to

conform to constitutional dictates ....'") (quoting Canton, 489 U.S. at 395) (O'Connor, J.,

concurring in part and dissenting in part)).  Something more is required to provide evidence of

the notice needed to give rise to deliberate indifference.  Id. at 1367 (evidence of sufficient notice

and a conscious choice to proceed with disregard for the likely violation of citizens' rights is

essential because without these limitations "'failure to train' would become a talismanic

incantation producing municipal liability '[i]n virtually every instance where a person has had his

or her constitutional rights violated by a city employee'—which is what Monell rejects.") (Alito,

J., concurring) (quoting Canton, 489 U.S. at 392).  Thus, plaintiffs' heavy reliance on the manner

and means by which the officers purportedly conducted themselves and handled the situation on

May 8, 2009, cannot be used to support their Monell claim against the Borough.

Moreover, the litany of post-event conduct cited by plaintiffs is wide of the mark for the

same reasons.  All of the officers' conduct referenced by plaintiffs is post-event save the incident

involving Hrubovcak in Florida.  For example, most of Lynk's multiple failures to follow

procedure and comply with department policy occurred after May 8, 2009, and all such incidents

do not involve any form of conduct that was even remotely related to the type of constitutional

violations at issue here.  And contrary to the picture plaintiffs seek to paint, the record

demonstrates that Hrubrovcak's pre-hire incident was investigated by Chief Bongivengo prior to

Hrubrovcak's hiring.  Quibbling over the thoroughness or outcome of Chief Bongivengo's

investigation is not a proper basis for proceeding with the claim against the Borough.  Id. at 1363

(constitutionally deficient conduct involves significant and woefully deficient training or review

and arguments regarding nuanced or additional degrees of the same are beyond the constitutional

18

concerns undergirding <u>Monell</u>); <u>Grazier v. City of Philadelphia</u>, 328 F.2d 120, 125 (3d Cir.

2003) ("The scope of failure to train liability is a narrow one . . . particularly  . . . where, as here,

the plaintiffs merely allege that a different training program than the one in place would have

been more effective.") (quoting and citing <u>Brown v. Muhlenberg Tp.</u>, 269 F.3d 205, 215 & 216

(3d Cir.2001).  Thus, the officer conduct referenced by plaintiffs does not create a genuine issue

of fact.

Plaintiffs' effort to shoehorn their claim into the "single-incident" exception to <u>Monell</u>'s

notice and deliberate indifference requirements equally is misplaced.  "<u>Canton</u> left open the

possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be

required in demonstrating deliberate indifference." <u>Connick</u>, 131 S.Ct. at 1361 (quoting <u>Bryan</u>

<u>County</u>, 520 U.S. at 409).  There, the Court posed a hypothetical in which a city chose not to

train its officers about constitutional limits on the use of deadly force.  <u>Id.</u>  It then unleashed its

armed police force to capture fleeing felons.  <u>Id.</u>  "Given the known frequency with which police

attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to

handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to

train the officers about constitutional limits on the use of deadly force could reflect the city's

deliberate indifference to the 'highly predictable consequence,' namely, violations of

constitutional rights." <u>Id.</u> (quoting <u>Bryan County</u>, 520 U.S. at 409).  "The Court sought not to

foreclose the possibility, however rare, that the unconstitutional consequences of failing to train

could be so patently obvious that a city could be liable under § 1983 without proof of a pre-

existing pattern of violations." <u>Id.</u>; <u>accord</u> <u>Brown</u>, 269 F.3d at 216 ("To survive summary

judgment on a failure to train theory, the [plaintiffs] must present evidence that the need for more

or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference.") (citation omitted).

In light of the initial and ongoing Act 120, firearms, and taser training that Borough officers undergo, the record  is woefully deficient of evidence showing that First and Fourth Amendment violations like those in question are an "obvious consequence" of the Borough's decision not to provide additional and more nuanced training, supervision or on-the-job review. That an officer with such training might be called upon to arrest an individual for public intoxication in front of a crowd of onlookers while another individual was being critical of the decision to do so does not present a scenario involving a "highly predictable" danger of violating citizens' constitutional rights.  Thus, in the absence of a pattern of violations in such a setting the Borough was and remains entitled to rely on the training regime in place.

Furthermore, plaintiffs' efforts to show how more or better supervision or training might have avoided the alleged violation of rights is unavailing on this score as well.  That the Borough's officers might confront situations where they must arrest individuals in public while maintaining officer safety and handling vocal criticism of their behavior could certainly be recognized as a scenario where grey areas involving First and Fourth Amendment rights might arise.  But arguing that more nuanced or better training and supervision might have produced a different outcome is not sufficient.  To maintain a "single-incident" basis for <u>Monell</u> liability, plaintiffs must point to a scenario or situation where it was patently obvious that the lack of pre-hiring investigation, training or supervision (or the lack of more nuanced or better investigation, training or  supervision) would result in the constitutional violation of citizens' rights in the manner alleged by plaintiffs.  In other words, it must be shown that it was so predictable that failing to provide such investigation, training or supervision would result in a violation of

constitutional rights, that doing so amounted to a conscious disregard for plaintiffs' First and/or

Fourth Amendment rights.  See Connick, 131 S. Ct. at 1365.  Their evidence in opposition to the

Borough's motion simply fails to rise to this level.  Consequently, they cannot proceed under the

narrow range of "single-incident" liability that the Court left open in Canton.

     Finally, plaintiffs have failed to produce sufficient evidence to prove that the purported

shortcomings which they identify can be found to have been the cause of their asserted injuries.

As previously noted, to succeed under Monell a plaintiff must be able to prove "a direct causal

link between the municipal action and the deprivation of federal rights."  Id. at 1368 (Alito, J.,

concurring) (quoting Bryan County, 520 U.S. at 404); accord Li Min v. Morris, 445 Fed. Appx.

574, 575  (3d Cir. Sept. 21, 2011) ("Plaintiffs who seek to impose liability on local governments

under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury.")

(quoting Connick, 131 S. Ct. at 1359); Doe v. Luzerne County, 660 F.3d 169, 180 (3d Cir. 2011)

("Moreover, for liability to attach in this circumstance the identified deficiency in a city's training

program must be closely related to the ultimate injury, . . . meaning that the plaintiff must 'prove

that the deficiency in training actually caused the constitutional violation at issue.'") (quoting

Canton, 489 U.S. at 391).

     "The exact language used to articulate the causation requirement differs for each theory of

relief."  Li Min, 445 Fed. Appx. at 576.  To show that an injury was caused by an improper

hiring policy, a plaintiff must demonstrate that "scrutiny of an applicant's background would lead

a reasonable policymaker to conclude that the plainly obvious consequence of the decision to

hire the applicant would be the deprivation of a third party's federally protected right."  Id.

(quoting Bryan County, 520 U.S. at 1382).  To show that an injury was caused by a policy of

failing to supervise, a plaintiff must demonstrate that the existing supervision regime "created an

unreasonable risk" of unconstitutional conduct.  Id. (quoting Brown v. Muhlenberg Twp., 269

F.3d 205, 216 (3d Cir.2001).  Finally, to show an injury was caused by a policy of failing to

train, a plaintiff is required to demonstrate a direct causal link between the constitutionally

offensive municipal policy and the deprivation in question.  See Connick, 131 S. Ct. at 1368

(Alito, J., concurring).

     Plaintiffs have failed to advance any evidence to show a direct causal link between the

identified deficiencies and their injuries.  Plaintiffs appear to contend that the officers did not

understand how to permit Sallie to voice criticisms of the police and simultaneously maintain

crowd control and/or to arrest him and Perkins without using an improper degree of restraint and

force.  But plaintiffs' position is the Tooch simply arrested Sallie after he failed to comply with

an order to go back into the house and Lynk tasered Sallie twice as part of the process of

arresting him.  Perkins was arrested for voicing opposition to the arrest of Sallie.  Assuming

these bases to be the accurate grounds for the arrests, they merely demonstrate that the officers'

dissatisfaction with plaintiffs' failure to comply with the officers' directives was the "moving

force" behind the treatment they received at the hands of the officers.  Of course, such intentional

conduct does not speak to and provide evidence that a municipal policy caused the constitutional

violations.  Cf. Connick, 131 S. Ct at 1367 n. 12 (the longstanding rule is that to prove municipal

liability a plaintiff must show that the deprivation of federal rights was caused by the

municipality's own wrongful conduct,  not that the municipality ultimately is responsible for the

torts of its employees) and 1368 (evidence of an employee's intentional misconduct essentially

works to disprove that a Monell failure in policy was the moving force behind the violation)

(Alito, J., concurring); accord Li Min, 445 Fed. Appx. at 576 (asking a court to assume that a

municipal policy caused the asserted violation of constitutional rights with little to no proof of

the same beyond the violation by the employee seeks, in effect, to impose *respondeat superior* liability); Douglas v. Brookville Area School Dist., -- F. Supp.2d --, 2011 WL 6116449, *23 (Dec. 8, 2011) (neither mistakes by trained officers nor willful violations are probative evidence of inadequate training claims).  It follows that the Borough is entitled to summary judgment for this reason as well.

Plaintiffs seek partial summary judgment on liability on Counts 1 through 3 and 5 for Sallie and on Count 6 for Perkins.  Defendants contend that material issues of fact remain for trial.

"Where the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent."  National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  The Third Circuit has explained that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."  Id. (citing Resolution Trust Corp. v. Gill, 960 F.2d 336, 340 (3d Cir. 1992)).  In other words, in order to be entitled to summary judgment a plaintiff must "produce enough evidence to justify a directed verdict in its favor in order to meet its initial burden."  Id. n. 2 (quoting with approval Celotex,  477 U.S. at 331 (Brennan, J., dissenting) and citing with approval William W. Schwarzer *et al.*, THE ANALYSIS AND DECISION OF SUMMARY JUDGMENT MOTIONS, 139 F.R.D. 441, 477 (1991)).

Plaintiffs' motion for summary judgment is not without force.  The record presents a close call as to whether Sallie's conduct in making the statements is entitled to First Amendment protection as a matter of law.  But given the high burden that plaintiffs must meet to obtain judgment as a matter of law and the insight and understanding that can be gained from the

testimony of first-hand witnesses to the events in question when filtered through the lenses of

demeanor, credibility and cross-examination, their motion must be denied without prejudice to

renew in the form of a Rule 50 motion at trail.

Sallie moves for partial summary judgment on the following counts:

- Count I for unlawful seizure under the Fourth Amendment against Tooch and Lynk;
- Count II for unreasonable force under the Fourth Amendment against Lynk;
- Count III for false imprisonment under the Fourth Amendment against Tooch and Lynk;
- Count IV for retaliation for exercise of First Amendment rights against Tooch and Lynk;

Perkins moves for summary judgment on Count VI for unlawful seizure under the Fourth

Amendment against Hrubovcak and Tooch.

Plaintiffs base their motion on the ground that their constitutional rights were

"indisputably and grossly violated."  They emphasize the high level of First Amendment

protection afforded to speech involving government impropriety.  See Swineford v. Snyder Cty.,

15 F.3d 1258, 1274 (3d Cir. 1994) ("Speech involving government impropriety occupies the

highest rung of First Amendment protection.").  They further note that a Fourth Amendment

violation occurs when a seizure or arrest, without probable cause, is carried out in retaliation for

protected speech.  Defendants maintain that there are material issues of fact with respect to all of

the counts in question and the radically different accounts of the actual events on the night of

May 8, 2009, must be resolved before liability can be determined.

 "If there is a bedrock principle underlying the First Amendment, it is that the

government may not prohibit the expression of an idea simply because society finds the idea

itself offensive or disagreeable."  Texas v. Johnson ,491 U.S. 397, 414 (1989).  Pursuant to the

constitutional guarantee of free speech, a state may not "…forbid or proscribe advocacy of the

use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." <u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447-448 (1969).   In undertaking this inquiry, the Supreme Court requires "…careful consideration of the actual circumstances surrounding such expression…" <u>Johnson</u>, 491 U.S. at 409.

Sallie was arrested for and charged with, among other offenses, disorderly conduct in violation of 18 Pa. C. S. § 5503(a).  In <u>Gilles v. Davis</u>, 427 F.3d 197 (3d Cir. 2005), the court considered the scope of this offense when the violating behavior consists of words spoken in a public forum.  It observed:

> Under the statute, whether "words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance." <u>Commonwealth v. Hock</u>, 556 Pa. 409, 728 A.2d 943, 946 (1999). When the regulated conduct consists of speech, however, the statute must "be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." <u>Johnson v. Campbell</u>, 332 F.3d 199, 211 (3d Cir.2003) (quoting <u>Gooding v. Wilson</u>, 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)); <u>Commonwealth v. Mastrangelo</u>, 489 Pa. 254, 414 A.2d 54, 58 (1980) ("disorderly conduct statute may not be used to punish anyone exercising a protected First Amendment right"). Speech that does not receive First Amendment protection, in turn, "include[s] the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words[.]" <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

<u>Gilles</u>, 427 F.3d at 204.

The relevant inquiry here is whether Sallie's expressions can be found to have arisen to the level of fighting words.  Fighting words are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." <u>Id.</u> (quoting <u>Chaplinsky</u>, 315 U.S. at 571– 72 and citing <u>Johnson</u>, 491 U.S at 409 ("To be punishable, words must do more than bother the listener; they must be nothing less than an invitation to exchange fisticuffs.") (quoting <u>Chaplinsky</u>, 315 U.S. at 572–73).  "Put another way, fighting words are 'likely to provoke the

average person to retaliation, and thereby cause a breach of the peace.'"  Id.  (quoting Johnson, 491 U.S. at 409).

It cannot be questioned that Sallie's statements of disapproval of police conduct, without consideration of context and the manner in which they were directed and delivered, were words in and of themselves that would fall within the ambit of First Amendment protection.  See Johnson, 332 F.3d at 212 ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.") (quoting City of Houston v. Hill, 482 U.S. 451, 462–63 (1987) (holding that ordinance making it unlawful to interrupt a policeman in the execution of his duty was overbroad)).  "Indeed, the Supreme Court has suggested that the 'fighting words' exception 'might require a narrower application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'"  Id.  (quoting City of Houston, 482 U.S. at 462 (quoting Lewis v. City of New Orleans, 415 U.S. 130, 135 (1974) (Powell, J., concurring)).

But the analysis cannot proceed based on consideration of the words in a vacuum.  Since the days of  Schenck v. U.S., 249 U.S. 47 (1919), it has been understood that "[t]he most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic."  Id. at 52.  In other words, context and surrounding circumstances must be taken into account.  Id.  ("The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.");  accord Johnson, 491 U.S. at 409 (same); Bridges v. State of Cal., 314 U.S. 252, 296 (1941) ("One cannot yell 'Fire' in a

crowded theater").  Whether any particular form of expression presents "a clear and present danger" or is within the realm of "fighting words" is "a question of proximity and degree." Bridges, 314 U.S. at 296 (quoting Schneck, 249 U.S. at 52).  In the words of Justice Brandeis, speech that transgresses the protections afforded by the First Amendment and that which remains within its protections must be determined through  "a rule of reason" and the exercise of sound judgment.  Id. (citing Schaefer v. United States, 251 U.S. 466, 482 (1920)).  And this principle extends to verbal criticism of police action.  See City of Houston, Texas v. Hill, 482 U.S. 451, 463 n. 12 (1987) ("The freedom verbally to challenge police action is not without limits, of course; we have recognized that 'fighting words' which 'by their very utterance inflict injury or tend to incite an immediate breach of the peace' are not constitutionally protected."); Startzell v. City of Philadelphia, 533 F.3d 183, 204 (3d Cir. 2008) ("the First Amendment is not an absolute shield against a disorderly conduct charge.  See Commonwealth v. Gowan, 399 Pa.Super. 477, 582 A.2d 879, 881 (1990) ("It is uncontrovertible that the exercise of free speech can go beyond constitutionally protected boundaries to the realm of prohibited and criminal behavior.")).

 As previously noted, there is a factual dispute regarding the events leading up to plaintiffs' arrests.  For the purposes of the plaintiffs' partial summary judgment motion, the defendants' version of the facts must be credited.

Defendants rely on the totality of the circumstances surrounding Sallie's statements and the context in which they were made to supply meaning to their substantive content.  The officers had just responded to a call reporting disorderly conduct and witnessed an intoxicated individual, known to be disruptive and defiant, jump on the back of another individual and begin to choke him. As they were arresting him, a crowd began to gather next door after partying and

Sallie began to make critical remarks of the officers from his porch.  It was 10:30 p.m. on a Friday night, and the area was known for drug and other criminal activity.

According to the officers, Sallie's words, tone, and body language coupled with the crowd's size and movement toward them ultimately created a dangerous situation.  Feeding on Sallie's cues, the crowd became increasingly focused on and "became verbally and physically aggressive toward the officers."  Lynk's Dep. at p. 5:15-16.   As the situation progressed the crowd began using "cuss words, MF'er this, that," and "derogatory" terms.  Lynk's Dep. at p. 44:10-11.  The crowd began to move closer to the officers.  The officers recognized several of the individuals in the crowd as individuals known to be involved in drugs and to carry weapons. As the crowd drew closer and more rowdy in response to Sallie's derisive comments, all of the officers began to fear for their safety and the safety of the crowd and onlookers who had gathered in the street. The officers felt physically threatened in light of the known criminal history of some members of the crowd and the belief that a number of them were armed.  They also believed that some of the individuals might resort to throwing things such as bottles, bricks or similar objects.

It was only after the crowd began to react to Sallie's ongoing criticisms and close in on the officers that Tooch sought to control the threat from the crowd by removing Sallie, the primary inciter.  He directed Sallie to be quite but Sallie refused.  He then directed Sallie to go back into his house but Sallie again refused and indicated he would not comply with the directive; Sallie was then arrested.

In the event the jury credits defendants' version of the factual events, Sallie's First Amendment rights would not be violated.  The jury could conclude that Sallie's ongoing criticisms began at a certain point to fuel resentment and hostility in the members of crowd.  His

persistence in continuing to heckle the police in performing their duties while the crowd was gathering and becoming more engaged took on a character that had a tendency to incite an immediate breach of the peace.  Refusing to cease after that character comes to light is precisely where speech of the highest rung goes beyond its protected boundaries and becomes prohibited and criminal activity.

Assuming the jury were to credit defendants' account in its entirety, a reasonable juror could likewise agree that the defendants had probable cause to arrest Sallie and Perkins.[4]  The jury may conclude that the officers had probable cause to believe Sallie had the intent to cause public annoyance or alarm or was recklessly creating a risk thereof  and caused an unjustifiable risk of a public disturbance.  It could also conclude that Perkins committed that same offense by engaging in repeated efforts to thwart the arrest of Sallie.

Material issues of fact likewise remain on Sallie's excessive force claim.  Claims of excessive force by police officers in the context of an arrest or other "seizure" are to be analyzed under the Fourth Amendment.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004); Sharrar v. Felsing, 128 F.3d 810, 820 (3d Cir.1997) ("When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment ....'") (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)).  "The proper test for evaluating an excessive force claim is therefore one of objective reasonableness," id., which "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting

---

[4] The opposite equally is true if the jury finds the facts in Sallie's and/or Perkin's favor.  The point is that plaintiffs have the burden of proof on their claims and are entitled to the First Amendment protection they seek if they prove their entitlement to it.

arrest or attempting to evade arrest by flight." Id. at 821.   The question is whether, under the totality of the circumstances, the officers' actions were objectively reasonable in light of facts and circumstances confronting them, without regard to their underlying intent or motivations. Kopec v. Tate, 361 F.3d 772, 776 (3d Cir.2004); Graham, 490 U.S. at 397.

An officer's actions must be evaluated from the perspective of a reasonable officer on the scene, rather than with the  benefit of hindsight. Rivas, 365 F.3d at 198; Lamont v. New Jersey, No. 09–1845, 2011 WL 753856, at *5 (3d Cir. Mar. 4, 2011) ("Monday morning quarterbacking is not allowed").  In undertaking this inquiry, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.  Thus, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, is constitutionally unreasonable." Id.

Material disputes involving issues of historical fact underlying a determination of whether the use of force objectively was reasonable under a totality of the circumstances are to be resolved by a jury where they pertain to whether a constitutional violation even occurred. Curley v. Klem, 499 F.3d 199, 211 (3d Cir. 2007).  At this juncture, all genuine factual disputes must be resolved in defendants' favor. Gilles, 427 F.3d at 207.  Given the defendants' version of the events, a jury may well conclude that Sallie resisted arrest and that the force Lynk applied objectively was reasonable and therefore constitutional.

In conclusion, plaintiffs have failed to advance sufficient evidence to support the elements of their Monell claim against the Borough.  Defendants also seek summary judgment on all counts related to Lutton, and plaintiffs do not contest this aspect of defendants' motion.

Material issues of fact remain as to plaintiffs' motion for summary judgment as to liability against the remaining defendants.  Consequently, defendants' partial motion for summary judgment will be granted and plaintiffs' motion for summary judgment on liability will be denied.  An appropriate order will follow.


Date: March 23, 2012


                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge


cc:      Patrick Sorek, Esquire
         Douglas C. Hart, Esquire
         Charles H. Saul, Esquire
         Kyle T. McGee, Esquire

         (*Via CM/ECF Electronic Mail*)